**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TOSHIBA CORPORATION,

        Plaintiff,

    v.

CDI MEDIA, INC.,

        Defendant.

No. 13 Civ. 06760 (SAS)

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF TOSHIBA CORPORATION'S**
**MOTION FOR SUMMARY JUDGMENT**

QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................1

FACTUAL BACKGROUND ..............................................................................................2

    The DVD Patent Licensing Program ........................................................................2

    The License Agreement ............................................................................................2

    Toshiba Voluntarily Adds CDI To The Licensee List ...............................................4

    CDI Repeatedly Breaches The License Agreement ...................................................4

    DVD6C Repeatedly Demands That CDI Comply with Its Contractual Obligations ..........5

    CDI Continues to Manufacture and Sell DVD Discs While Acknowledging That
        The Discs Are "Covered by Many Patents" and Failing to Report or Pay
        the Royalties It Owes for Them ..........................................................................7

LEGAL STANDARD ........................................................................................................8

ARGUMENT ...................................................................................................................9

I.     THE LICENSE AGREEMENT IS VALID AND IN FULL FORCE AND
      EFFECT ................................................................................................................10

    A.     The License Agreement Is A Valid, Fully Integrated Written Contract ...............10

    B.     The License Agreement Has Not Been Terminated .............................................11

II.    CDI HAS BREACHED THE LICENSE AGREEMENT .................................................14

III.   CDI HAS NOT ASSERTED ANY VALID DEFENSES TO TOSHIBA'S
      CLAIM ................................................................................................................14

    A.     Toshiba's Claim For Damages Representing Royalties Due For The
        Semiannual Periods Since January 1, 2007 Falls Within The Applicable
        Statute of Limitations Period .........................................................................16

    B.     CDI's Third, Fourth And Eighth Affirmative Defenses Are Inapplicable
        To The Facts Of This Case ...........................................................................17

    C.     CDI's Contract-Related Defenses Are Without Legal Or Evidentiary
        Support ......................................................................................................19

D. CDI's Conclusory Fraud Defenses Are Legally Deficient ....................................20

E. Toshiba's Conclusory Defense of "Anti-Competitive Practices" Is Unsupported by Any Evidence or Legal Basis ......................................................22

IV. CDI OWES TOSHIBA NEARLY $6 MILLION BASED ON ITS OWN WEBSITE ..............................................................................................................22

CONCLUSION ..............................................................................................................23

**TABLE OF AUTHORITIES**

Page

**Cases**

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*,
    404 F.3d 566 (2d Cir. 2005)..................................................................18

*Beautiful Jewellers Private Ltd. v. Tiffany & Co.*,
    438 Fed. App'x 20 (2d Cir. 2011) .........................................................9

*Broder v. Cablevision Sys. Corp.*,
    418 F.3d 187 (2d Cir. 2005)..................................................................20

*Bill Diodato Photography LLC v. Avon Prods., Inc.*,
    No. 12 Civ. 847, 2012 WL 4335164 (S.D.N.Y. Sept. 21, 2012) ...........10

*Caruso v. Grace*,
    No. 11 Civ. 2353, 2011 WL 4472479 (S.D.N.Y. Sept. 27, 2011) ........10

*Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc.*,
    807 F. Supp. 1007 (S.D.N.Y. 1992)......................................................17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .............................................................................15

*Coastal Power Int'l, Ltd. v. Transcon. Capital Corp.*,
    10 F. Supp. 2d 345 (S.D.N.Y. 1998)....................................................18

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*,
    74 N.Y.2d 475 (1989) ..........................................................................10

*Colman & Hirschmann, Inc. v. Little Tikes, Inc.*,
    No. 84 Civ. 1296, 1986 WL 4688 (S.D.N.Y. Apr. 17, 1986).................12

*Continental Airlines, Inc. v. Lelakis*,
    943 F. Supp. 300 (S.D.N.Y. 1996), *aff'd*, 129 F.3d 12 (2d Cir. 1997) ..................15

*Diamond Servs. Mgmt., LLC v. Fable Jewelry Co., Inc.*,
    No. 12 Civ. 3543, 2012 WL 5871616 (S.D.N.Y., Nov. 20, 2012) ......9, 14

*EBS Dealing Res., Inc. v. Intercontinental Exch., Inc.*,
    379 F. Supp. 2d 521 (S.D.N.Y. 2005).................................................21

*FDIC v. Giammettei*,
    34 F.3d 51 (2d Cir. 1994)....................................................................15

*Fishoff v. Coty, Inc.*,
    No. 09 Civ. 628, 2009 WL 2146791 (S.D.N.Y. July 17, 2009) ...........10

*Greenfield v. Philles Records, Inc.*,
    98 N.Y.2d 562 (2002) ..........................................................................10

*Guilbert v. Gardner*,
    480 F.3d 140 (2d Cir. 2007)............................................................................16

*Hicks v. Baines*,
    593 F.3d 159 (2d Cir. 2010)............................................................................16

*Int'l Fid. Ins. Co. v. Aulson Co., Inc.*,
    No. 11 CIV. 9240, 2012 WL 6021130 (S.D.N.Y. Dec. 4, 2012)....................15

*Joseph Victori Wines, Inc. v. Vina Santa Carolina S.A.*,
    933 F. Supp. 347 (S.D.N.Y. 1996) .................................................................11

*In re Livent, Inc. Noteholders Sec. Litig.*,
    355 F. Supp. 2d 722 (S.D.N.Y. 2005).............................................................16

*MM Arizona Holdings LLC v. Bonanno*,
    685 F. Supp. 2d 589 (S.D.N.Y. 2009)........................................................21, 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574, 106 S. Ct. 1348 (1986)...............................................................8

*Maxim Grp. LLC v. Life Partners Holdings, Inc.*,
    690 F. Supp. 2d 293 (S.D.N.Y. 2010)........................................................17, 18

*Morris v. Lee*,
    No. 08 Civ. 6673 LAP, 2011 WL 721663 (S.D.N.Y. Feb. 24, 2011) ............11, 14

*Niagara Mohawk Power Corp. v. Jones Chem., Inc.*,
    315 F.3d 171 (2d Cir. 2003)..............................................................................8

*Overton v. N.T. State Div. of Military & Naval Affairs*,
    373 F.3d 83 (2d Cir. 2004)................................................................................9

*Point 4 Data Corp. v. Tri-State Surgical Supply & Equipment, Ltd.*,
    No. 11 Civ. 726, 2013 WL 4409434 (E.D.N.Y. Aug. 2, 2013) .......................17

*RST (2005) Inc. v. Research in Motion Ltd.*,
    No. 07 Civ 3737, 2008 WL 5416379 (S.D.N.Y. Dec. 17, 2008)..................17, 18

*Romach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)............................................................................21

*Thyroff v. Nationwide Mut. Ins. Co.*,
    460 F.3d 400 (2d Cir. 2006)............................................................................20

*Woo v. Times Enter., Inc.*,
    No. 98 CIV. 9171, 2000 WL 297114 (S.D.N.Y. Mar. 22, 2000) ..................15, 21

*Yurman Design Inc. v. Chaindom Enters., Inc.*,
    No. 99 Civ. 9307, 2000 WL 897141 (S.D.N.Y. July 5, 2000) ......................20, 21

*Zahler v. Twin City Fire Ins. Co.*,
    No. 04 Civ. 10299, 2006 WL 846352 (S.D.N.Y. Mar. 31, 2006) .........................10

## **Statutes**

Fed. R. Civ. P. 9(b) ...........................................................................................................20

Fed. R. Civ. P. 56(a) ...........................................................................................................8

N.Y. C.P.L.R. § 213(2) ......................................................................................................16

Plaintiff Toshiba[1] respectfully submits this memorandum of law in support of its motion for summary judgment pursuant to Fed. R. Civ. P. 56(a).

## PRELIMINARY STATEMENT

This case presents a simple and indisputable breach of contract. The parties entered into a written License Agreement pursuant to which CDI was granted a non-exclusive license to make and sell DVD discs utilizing hundreds of essential patents owned by the DVD Patent Licensing Group and in return, agreed to submit semiannual royalty reports and pay royalties due at the rate of $0.05 per disc. CDI has since made and sold **hundreds of millions of DVD discs** (a fact advertised prominently on its website) utilizing the licensed technology. But CDI has never submitted a single royalty report **or paid a single cent in royalties**, despite the Licensing Group's persistent efforts to cause CDI to meet its contractual obligations.

Instead of complying with those obligations, CDI has resorted to excuses, must recently conjuring up the *post hoc* argument—developed by counsel and asserted for the first time in 2013—that the License Agreement was terminated when the Licensing Group said it would remove CDI from the list of licensees in good standing on its website if CDI did not report and pay the royalties it owed. Not only is this argument patently absurd given CDI's continuing use of the licensed technology—and the even greater legal exposure for CDI if it were an unlicensed infringer—the very correspondence (an email exchange) CDI has exhumed to support its argument demonstrates that the license was **not** terminated as CDI belatedly maintains. Rather, the evidence here plainly shows that the parties have a binding License Agreement; that CDI brazenly ignored its obligations under that agreement; and that CDI is now responsible to

---

[1] All capitalized terms not herein defined shall be afforded the meaning assigned them in Plaintiff's Rule 56.1 Statement of Undisputed Facts ("SUF").

Toshiba for the royalties that came due, and the contractual interest thereon, during the six years preceding the filing of the complaint.

## FACTUAL BACKGROUND

**The DVD Patent Licensing Program**

Toshiba is the authorized licensor for the members of the DVD Patent Licensing Group. (SUF ¶ 1.) The DVD Patent Licensing Group consists of nine leading developers of DVD technology: Hitachi Consumer Electronics Co., Ltd. (successor to Hitachi, Ltd.); JVC KENWOOD Corporation (successor to Victor Company of Japan, Ltd.); Mitsubishi Electric Corporation; Panasonic Corporation (formerly Matsushita Electric Industrial Co., Ltd. ("Matsushita")); Samsung Electronics Co., Ltd.; Sanyo Electric Co., Ltd.; Sharp Corporation; Toshiba Corporation; and Warner Bros. Home Entertainment, Inc. (successor to Warner Home Video, Inc. and Time Warner, Inc.).[2] (*Id.* ¶ 5.) Members of the DVD Patent Licensing Group own patents in multiple jurisdictions on underlying technologies essential to make, use and sell DVD products, including DVD discs. (*Id.* ¶ 7.) The members of the DVD Patent Licensing Group have authorized Toshiba to license these patents jointly in a single portfolio license. (*Id.*.) Such a joint licensing arrangement is often referred to as a "patent pool." (*Id.* ¶ 8)

**The License Agreement**

Effective as of April 1, 2003, Toshiba, on behalf of the members of the DVD Patent Licensing Group, entered into the License Agreement with CDI.[3] (SUF ¶ 11.) The License

---

[2] The DVD Patent Licensing Group is often referred to as "DVD6C" or "6C." The "6C" designation stems from the fact that the group originally had six members. (SUF ¶ 6.)

[3] The parties simultaneously executed a two-page letter agreement to amend and supplement the terms and conditions of the License Agreement. That letter agreement is appended to the License Agreement (*see* Tsushima Decl. Ex. 1). (SUF ¶ 12.) All references to the terms and conditions of the License Agreement herein are to the License Agreement as amended by the letter agreement.

Agreement grants CDI "a non-exclusive, non-transferable license to make, have made, use, sell, and otherwise dispose of DVD Products." (*Id.* ¶ 13.) In return, CDI agreed to report and pay royalties on a semiannual basis for the licensed DVD Products sold or otherwise transferred at the rate of U.S. $0.05 per disc.[4] (*Id.* ¶¶ 17.) CDI further agreed to pay interest at the rate of two percent (2%) per month for any payments not made by the date due. (*Id.* ¶ 19.)

The License Agreement expressly lists, in Exhibit 2, over 700 patents included in the license granted thereunder. (*Id.* ¶ 14.) Moreover, the License Agreement defines the licensed "DVD Patents" as not just the currently issued patents listed on Exhibit 2 but "all patents owned by members of the Group, now or hereafter during the term of this Agreement, that are Essential to make, use, or sell DVD Products." (*Id.* ¶ 15.). DVD6C publishes a current list of the DVD Patents covered by the DVD6C license on its website. (*Id.* ¶ 16.) The License Agreement provides for resolution of disputes (and the parties' consent to jurisdiction) in New York, as well as the application of New York law "without reference to the conflicts of laws principles thereof." (*Id.* ¶¶ 24-25.)

The License Agreement provides for automatic renewal for a five-year term at the end of the initial term, as well as at the end of each renewal term "unless Licensee notifies Licensor in writing of its intent to terminate this Agreement at least sixty (60) days prior to [the expiration of the initial term on December 31, 2007] or the expiration date of such renewed periods, as the case may be." (*Id.* ¶ 20.) CDI has never so-notified Toshiba. (*Id.* ¶ 21.)

The License Agreement also allows for termination by either party "on thirty (30) days' written notice to the other party in the event that the latter shall materially breach or fail to

---

[4]   On three separate occasions since the execution of the License Agreement, Toshiba, on behalf of the Members of the DVD Patent Licensing Group, has offered to enter into an amended license agreement with CDI at a lower royalty rate. (SUF ¶ 30.) But CDI has never accepted any of these offers. (*Id.* ¶ 32.)

perform any material obligation under this Agreement and such default is not remedied within thirty (30) days after notice is given specifying the nature of the default." (*Id.* ¶ 22.) It further provides that "[a]ny notice or request with reference to this Agreement shall be made by letter or facsimile, and shall be directed by one party to the other at its respective address [as specified]." (*Id.* ¶ 23.)

The License Agreement also contains a merger and integration clause that unequivocally states that the License Agreement "sets forth the entire agreement and understanding between the parties . . ." and requires that "any waivers, releases or representations (either express or implied) with respect to the subject matter of this Agreement" be set forth in a "writing signed by a duly authorized representative of the party to be bound thereby." (*Id.* ¶ 26.)

## Toshiba Voluntarily Adds CDI To The Licensee List

When it returned the fully-executed License Agreement to CDI in 2003, Toshiba sent CDI letters indicating that it would shortly add CDI to the list of licensees posted on the DVD6C website and requesting that CDI provide Toshiba the names of any of CDI's affiliates manufacturing DVD Products so they could be included on that list, which "***could help to promote your business by providing your customer with assurance of 6C DVD Essential Patents***." (SUF ¶ 28 (emphasis added).) Subsequently, Toshiba added CDI to the licensee list posted on the DVD6C website. (*Id.* ¶ 29.)

## CDI Repeatedly Breaches The License Agreement

According to CDI's website, it provides both CD and DVD duplication and CD and DVD replication services. (SUF ¶ 55.) In fact, CDI claims that it "has grown to become one of the nation's largest duplication centers." (*Id.*) In other words, CDI has made and sold and continues to make and sell DVD discs, as it was licensed to do by the License Agreement.

Since the inception of the License Agreement, CDI has never once submitted a royalty report. (*Id.* ¶ 33.) Nor has CDI paid any royalties due for any period from the effective date of the License Agreement through the date hereof. (*Id.* ¶ 34.) Despite its failure to pay, CDI continues to make and sell products that utilize licensed patents. (*See id.* ¶¶ 2-3, 55-56.)

**DVD6C Repeatedly Demands That CDI Comply with Its Contractual Obligations**

Since 2004, Toshiba has sent multiple notices to CDI reminding CDI that it is delinquent in its contractual obligations. (SUF ¶ 35.) CDI has never disputed any of these notices. (*Id.* ¶ 36.) On the contrary, it acknowledged its contractual obligations to report and pay royalties— and promised to make good in the future if Toshiba would forgive past royalties due, which Toshiba declined to do. (*Id.* ¶¶ 37-38.)

In February of 2008, a representative of Matsushita (DVD6C's Regional Representative for the Americas (*id.* ¶ 9)) emailed Allen Webb, CDI's President and Chief Financial Officer. (*Id.* ¶ 39.) The Matsushita representative stated that it was unfair to other DVD6C licensees who reported and paid their royalties that CDI was listed on the DVD6C licensee list "as if your company were a good-standing DVD6C licensee" and had thereby obtained membership in the Colonial Purchasing co-op even though it had failed to comply with its obligations under the license to report and pay royalties. (*Id.*) In response, Mr. Webb admitted that "you are correct in saying that CDI should live up to the contract we signed." (*Id.* ¶ 42.)

On July 22, 2008, when CDI had still failed to render any royalty report or payment, Matsushita sent CDI a follow-up email ("July 22, 2008 Email"), which reads as follows:

> Dear Mr. Allen Webb/CDI Media
>
> Hello. We hope you are doing well.
>
> Concerning DVD6C agreement between your company and DVD6C, unfortunately, the situation of your company has not

improved, and considering other licensees, we have to move to the
next step.

As a first step, we will de-list your company's name from DVD6C
licensee list soon.

We think your company is a member of Colonial Purchasing and
in case your company is de-listed from DVD6C licensee list, your
company loses the qualification of the membership of Colonial
Purchasing.

We strongly request your company should accomplish your
responsibility as soon as possible to avoid above first step.

If you have any questions, please let us know.

Best regards . . . .

(*Id*. ¶ 44.)  CDI did not respond to the July 22, 2008 Email.  (*Id.* ¶ 47.)

Even then, DVD6C did not act immediately to remove CDI's name from the licensee list

on its website.  On January 15, 2009, Toshiba sent Mr. Webb a letter ("January 15, 2009 Letter")

informing him that, starting in March of 2009, only licensees in good standing would be included

in the list of licensees posted on the DVD6C website.  (*Id.* ¶ 48.)  The January 15, 2009 Letter

explained that "[w]e define 'good standing' to mean any licensee that is currently in full

compliance with its obligations under the DVD6C Agreement."  (*Id.*)  The January 15, 2009

Letter then informed CDI that it had until February 15, 2009 to bring itself into compliance with

its obligations under the License Agreement in order to avoid being removed from the licensee

list on the website.  (*Id.*)  Again, this letter said nothing about termination of the License

Agreement.  (*Id.* ¶ 49.)  Nor did CDI suggest, in response to this letter, that Toshiba's request

and warning was irrelevant because CDI was no longer a licensee at all due to the License

Agreement having been terminated in 2008.  (*Id.* ¶ 50.)

Throughout 2009, 2010 and 2011, Toshiba continued to send CDI written reminders that

it owed royalty reports and payments for both past and current semiannual reporting periods.

(*Id.* ¶ 51.)  At no point did CDI respond to any of these reminders to suggest that it was no longer responsible for semiannual reports or payments for any reason.  (*Id.* ¶ 52.)  In fact, CDI **never** suggested the License Agreement had previously been terminated until ***May 1, 2013***, when its current counsel appeared.  (*Id.* ¶¶ 52-54.)   At that point, in response to a request from representatives of DVD6C to visit CDI, CDI's counsel sent them a letter refusing to allow the visit on the ground that the License Agreement "has long since been **terminated and/or abandoned** and never has been renewed; nor was it ever performed by either party, even in part."[5]  (*Id.* ¶ 53 (emphasis added).)  "If DVD6C chooses to pursue this matter in any formal way," CDI's counsel threatened, their client would "quite likely" file for "bankruptcy protection and/or . . . close its doors."  (*Id.*)

**CDI Continues to Manufacture and Sell DVD Discs While Acknowledging That The Discs Are "Covered by Many Patents" and Failing to Report or Pay the Royalties It Owes for Them**

CDI continues to make and sell DVD discs that utilize patents owned by the DVD Patent Licensing Group while remaining free of exposure to willful patent infringement claims.  CDI is well-aware of the importance of being licensed.  On its website, CDI informs its customers that ***"[t]he technology behind CD and DVD products and the Replication of optical media are covered by many patents"*** and warns them to ensure that their DVD suppliers are licensed because ***"[s]ome duplicators charge lower prices because they do not pay their royalties and you can ultimately be liable."***  (SUF ¶¶ 57-61 (emphasis added).)  CDI goes so far as to suggest

_____

[5]  Notably, nowhere in this letter did CDI's counsel suggest that the License Agreement had been terminated in 2008 due to the removal of CDI from the list of DVD6C licensees in good standing.

its customers search the Philips Electronics website to see if their suppliers are listed in Phillips' Licensee database.[6] (*Id*. ¶ 60; *see also id.* ¶¶ 58, 61.)

Despite its professed concern about DVD replicators that fail to pay royalties for the "many patents" covering their products, CDI has persistently refused to submit royalty reports or to pay royalties as required by the License Agreement. On its own website, CDI brags that it had manufactured **115,202,306 DVDs** as of August 19, 2013, **when it held a contest, inviting customers to guess how many CDs and DVDs it had manufactured** and posted the winning answer. (*Id.* ¶ 62.) Following that contest—and to the present day—CDI has posted a running ticker on its website indicating the number of DVDs it has manufactured. (*Id*. ¶ 64.) This is the very information that Toshiba was entitled to receive on a semiannual basis under the License Agreement and that CDI consistently refused to provide.

Shortly after CDI posted the results of its contest—disclosing for the first time the number of DVD discs it had manufactured—Toshiba filed the present lawsuit.

## LEGAL STANDARD

Summary judgment is appropriate when the movant demonstrates "that there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once such a showing is made, the burden is on the non-movant to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Rather, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Id*. 475 U.S. at 587, 106 S. Ct. at 1356; *see also Niagara Mohawk Power Corp. v. Jones Chem., Inc*., 315 F.3d 171, 175 (2d Cir. 2003) (the "mere existence of a scintilla of

---

[6] Phillips is the authorized licensor for a separate group of essential-patent-owning companies, sometimes referred to as "DVD3C" or "One-Red" (SUF ¶ 10.)

evidence . . . [is] insufficient"). *Overton v. N.T. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004).

## ARGUMENT

Toshiba has asserted a breach of contract claim against CDI for its failure to provide semiannual reports and pay royalties due for licensed DVD Products sold or otherwise transferred during the semiannual periods extending from January 1, 2007 through present, in violation of the License Agreement. (Compl. ¶¶ 23-28.) Toshiba further alleges that CDI's "ongoing failure to report and pay royalties due for the current and future semiannual periods constitutes further and continuing breaches of the License Agreement." (Compl. ¶ 27.)

Under New York law,[7] "the elements of a cause of action for breach of contract are (1) the existence of a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages suffered as a result of the breach." *Diamond Servs. Mgmt., LLC v. Fable Jewelry Co., Inc.*, No. 12 Civ. 3543, 2012 WL 5871616, at *3 (S.D.N.Y., Nov. 20, 2012) (Scheindlin, J.) (quoting *Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, 438 Fed. App'x 20, 21–22 (2d Cir. 2011)). Furthermore, "the interpretation of the contract is a matter of law for the court," and when interpreting a contract, a court "look[s] first to the parties' written agreement to determine the parties' intent and limit[s] its inquiry to the words of the agreement itself if the agreement sets forth the parties' intent clearly and unambiguously." *Id.* (quotation marks and modifications omitted). Here, Toshiba is entitled to summary judgment in its favor on its breach of contract claim because the License Agreement is a valid enforceable contract which CDI has breached.

---

[7] The License Agreement expressly states that it "shall be governed and construed according to the laws of New York." (SUF ¶ 25.)

# I. THE LICENSE AGREEMENT IS VALID AND IN FULL FORCE AND EFFECT

## A. The License Agreement Is A Valid, Fully Integrated Written Contract

On its face, the License Agreement is a valid, fully integrated written contract. "'The fundamental principle of contract interpretation under New York law is that contracts are construed according to the intent of the parties. The best evidence of that intent is what the parties have written in their agreement. A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Zahler v. Twin City Fire Ins. Co.*, No. 04 Civ. 10299, 2006 WL 846352, at *4 (S.D.N.Y. Mar. 31, 2006) (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002)) (internal citations omitted); *see also Fishoff v. Coty, Inc.*, No. 09 Civ. 628, 2009 WL 2146791, at *1 (S.D.N.Y. July 17, 2009) (Scheindlin, J.) (explaining that contracting parties' intent "may be gathered from the four corners of the instrument and should be enforced according to its terms").

In its Answer, CDI maintains for the first time that the License Agreement lacks specificity and so there was no meeting of the minds. (*See* Answer at ¶ 9-10, 12-13, 18.) The License Agreement is definite as to all necessary material terms, including licensed patents (SUF ¶¶ 14-15), price (*id.* ¶ 17, 19) and duration (*id.* ¶ 18) and therefore is enforceable. *See, e.g.*, *Caruso v. Grace*, No. 11 Civ. 2353, 2011 WL 4472479, at *9 (S.D.N.Y. Sept. 27, 2011) (Scheindlin, J.) (holding that agreement was sufficiently definite as to its material terms, including compensation, timing of performance, and particular steps to be taken); *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12 Civ. 847, 2012 WL 4335164, at *9 (S.D.N.Y. Sept. 21, 2012) (holding that agreements contained no suggestion that the parties' did not intend to form a contract where agreements provided for a one-year license with various conditions in exchange for a fee); *see also Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483 (1989) ("[C]ourts should not be 'pedantic or meticulous'" when determining

definiteness of contract terms).  The License Agreement, on its face, evinces a clear meeting of the minds of the parties, and is thus valid and enforceable.

Indeed, CDI's own prior correspondence refutes its belated claim that there was no meeting of the minds.  Not only did CDI never suggest that there was no meeting of the minds, but Allen G. Webb, CDI's President and CFO—*who signed the License Agreement on behalf of CDI*—specifically acknowledged the existence of the License Agreement and that Toshiba "[is] correct in saying that CDI should live up to the contract we signed."  (SUF. ¶ 42; *see also id.* ¶ 37 (CDI "would like to report our DVD production and pay the royalties that are due.").)

### B.    The License Agreement Has Not Been Terminated

CDI asserts in its Answer that the License Agreement "was terminated on or before July 22, 2008" (Answer, Fifth Affirmative Defense).  Notably, CDI never asserted that the License Agreement had been terminated until its counsel intervened in May 2013 to prevent representatives of DVD6C from visiting CDI.  (SUF ¶¶ 52-54.)  Prior to that date, and notwithstanding that Toshiba sent CDI no fewer than 20 reminders regarding overdue royalty reports and payments between July 22, 2008 and May 2013 (*see supra* Factual Background, at 5-7), CDI never asserted that the License Agreement had been terminated.  (SUF ¶ 54.)  CDI instead continued to manufacture and sell DVD discs, knowingly utilizing licensed patents, but failing to pay for their use.

In any event, CDI cannot show that the License Agreement was ever terminated.  "Under New York law, where the parties to a contract have agreed to a written termination clause, it must be enforced as written."  *Joseph Victori Wines, Inc. v. Vina Santa Carolina S.A.*, 933 F. Supp. 347, 352 (S.D.N.Y. 1996) (citing cases).  Accordingly, a written contract that contains an express procedure for, or conditions precedent to, termination cannot be terminated unless the procedure is strictly followed or the conditions precedent are met.  *See*, *e.g. Morris v. Lee*, No.

08 Civ. 6673 LAP, 2011 WL 721663, at *3-4 (S.D.N.Y. Feb. 24, 2011) (rejecting a termination claim because, even though the party wishing to terminate had good cause, it did not comply with the termination procedure); *Colman & Hirschmann, Inc. v. Little Tikes, Inc.*, No. 84 Civ. 1296, 1986 WL 4688, at *5 (S.D.N.Y. Apr. 17, 1986) (strictly interpreting a termination clause to require compliance with the procedure specified for terminating a contract and holding that steps taken "in contemplation of termination are not relevant" in light of noncompliance with that procedure).

Here, the License Agreement specifies a precise procedure to be followed by either party that wishes to terminate the agreement:

> 5.3 Either party may terminate this Agreement at any time on ***thirty (30) days' written notice to the other party*** in the event that the latter shall materially breach or fail to perform any material obligation under this Agreement and ***such default is not remedied within thirty (30) days after notice is given specifying the nature of the default***. Such right of termination shall not be exclusive of any other remedies or means of redress which the non-defaulting party may be lawfully entitled, and all such remedies shall be cumulative.
>
> . . . .
>
> 6.6 ***Any notice*** or request with reference to this Agreement ***shall be made by letter or facsimile***, and ***shall be directed by one party to the other at its respective address*** as follows:
>
> > In the case of Licensor to:
> >
> > Yoshitaka Honda
> > General Manager, License Management
> > Toshiba DVD License Services, Inc.
> > 5th Floor, Sumitomo-Hamamatsucho Bldg.,
> > 18-16, Hamamatsucho 1-chome, Minato-ku,
> > Tokyo 105-0013, Japan
> > TEL: +81-3-5777-3286
> > FAX: +81-3-5401-2503
> > E-mail: yoshitaka.honda@toshiba-tdls.co.jp
> >
> > In the case of Licensee to:

Allen G. Webb
VP/CFO
CDI Media, Inc.
2323 South 3600 West
Salt Lake City, UT 84119
U.S.A.
TEL: +1- (801) 977-0077
FAX: +1- (801) 977-3947
E-mail: awebb@cdimedia.com

(SUF ¶¶ 22-23 (emphasis added).)[8]

CDI cannot claim that either it or Toshiba followed this procedure to terminate the License Agreement. Instead, CDI's assertion that the License Agreement "was terminated on or before July 22, 2008" appears to rest solely on the July 22, 2008 Email (quoted in full at p. 8 above) from a representative of DVD6C to CDI about removing CDI's name from the list of licensees posted on the DVD6C website. The July 22, 2008 Email does not state that it is a notice of termination of the License Agreement. (*Id.* ¶¶ 44-45.) Indeed, it never uses the words "terminate" or "termination." It speaks only of "*delist*[ing] your company's *name* from [the] DV6C licensee list *soon*" and "*[a]s a first step*" that could still be "*avoid*[ed]" if "your company should accomplish your responsibility as soon as possible." (*Id.* ¶ 44 (emphasis added).)

The July 22, 2008 Email, moreover, does not comply with the requirements for a termination notice prescribed in Articles 5.3 and 6.6 of the License Agreement. It (a) is not a letter or facsimile (*id.* ¶ 23 (quoting License Agreement Art. 5.3)), (b) was not sent by a party to the License Agreement (*id.* (quoting License Agreement Art. 6.6)), and (c) does not "specify[]

---

[8] The License Agreement also granted CDI the right to terminate the License Agreement by sending written notice to Toshiba within 60 days of the end of the initial license term, or within 60 days of the end of any renewal period. (SUF ¶ 20.) Therefore, if CDI had wanted to terminate the License Agreement, it could have exercised this right in December 2007 or December 2012. It did not.

the nature of the default" (*id.* ¶ 22 (quoting License Agreement Art. 5.3)).  It therefore cannot have terminated the License Agreement.  *See Morris*, 2011 WL 721663, at *4.

## II.  **CDI HAS BREACHED THE LICENSE AGREEMENT**

The License Agreement grants CDI a non-exclusive, non-transferable license to make, have made, use, import, offer for sale, sell, and otherwise dispose of DVD Products.  (SUF ¶ 13.) In exchange, CDI agreed to report and pay royalties for DVD Products sold or otherwise transferred.  (*Id.* ¶ 17.)  CDI agreed to report the royalties due on a semiannual basis, within 45 days after the semiannual periods ending on June 30 and December 31 each year, and to pay all royalties due for such periods within 90 days after the end of these semiannual periods.  (*Id.* ¶ 18.)

CDI has never tendered any royalty reports or paid any royalties.  (*Id.* ¶ 33-34.) Nonetheless, as reported on its own website, CDI has continued to make and sell DVD Products utilizing licensed patents while remaining free from prosecution for infringement.  (*Id.* ¶¶ 55-56, 62, 64-65.)  Toshiba has thus performed its obligations under the License Agreement, while CDI has repeatedly breached its material obligations by failing to report or pay royalties due.  Toshiba has been damaged by CDI's breaches by reason of its failure to receive the royalties owed, and is therefore entitled to summary judgment.  *See Diamond Servs. Mgmt.*, 2012 WL 5871616, at *5.

## III.  **CDI HAS NOT ASSERTED ANY VALID DEFENSES TO TOSHIBA'S CLAIM**

In its Answer, CDI asserts a laundry-list of purported defenses to Toshiba's breach of contract claim, arguing that Toshiba's claim is barred or limited because of:

1.  failure to state a claim;

2.  the statute of limitations;

3.  laches;

4.  abandonment, waiver and/or estoppel;

5.      alleged termination of the License Agreement;

6.      alleged vagueness and/or indefiniteness of the License Agreement;

7.      Toshiba's alleged failure to perform;

8.      Toshiba's alleged failure to mitigate damages;

9.      Toshiba's alleged "material breach of any agreement between the parties and/or the material breach of the covenant of good faith and fair dealing";

10.     Toshiba's allegedly having "explicitly held out to the world and to CDI Media that patents within its patent pool were essential to the manufacture of DVDs . . . [and] such representations were false and misleading";

11.     Toshiba's having allegedly "made express representations regarding participation and compliance rates with its licensing programs, and the proper implementation of uniform and non-discriminatory licensing . . . [and] such representations were either false or misleading";

12.     Toshiba's having allegedly "engaged in anti-competitive practices, including improper groupings of both patents and licensors"; and

13.     a catch-all defense for "other defenses that may be discovered in the course of this lawsuit."

The record is devoid of any evidence that would support any of these purported defenses, all of which are insufficient to avoid summary judgment on Toshiba's claim for breach of contract.

Under Second Circuit law, on a motion for summary judgment, plaintiff only need show "that there is an absence of evidence to support an essential element" of an affirmative defense, on which the defendant bears the burden of proof at trial. *Woo v. Times Enter., Inc.*, No. 98 Civ. 9171, 2000 WL 297114, at *4 (S.D.N.Y. Mar. 22, 2000) (Scheindlin, J.) (quoting *Continental Airlines, Inc. v. Lelakis*, 943 F. Supp. 300, 305 (S.D.N.Y. 1996), *aff'd*, 129 F.3d 12 (2d Cir. 1997)).[9] The burden then shifts to the defendant to "set forth specific facts showing that there is

---

[9]   There is no requirement "that the moving party support its motion with affidavits or other similar material *negating* the opponent's claim." *FDIC v. Giammettei*, 34 F.3d 51, 54-55 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) (emphasis in original).

a genuine issue for trial." *Int'l Fid. Ins. Co. v. Aulson Co., Inc.*, No. 11 CIV. 9240, 2012 WL 6021130, at *3 (S.D.N.Y. Dec. 4, 2012) (citation omitted); *see also In re Livent, Inc. Noteholders Sec. Litig.*, 355 F. Supp. 2d 722, 729 (S.D.N.Y. 2005) ("[I]f Plaintiffs show that there is an absence of evidence in support of [defendants'] affirmative defense, they will be entitled to summary judgment on their . . . claim unless the defendants come forward with evidence supporting each essential element of the defense.").

"Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Here, the conclusory nature of CDI's pleading as well as CDI's scant Rule 26(a)(1) initial disclosures—through which CDI was required to disclose information that it "may use to support its . . . defenses"—only confirm that the defenses are spurious. (*See* SUF ¶¶ 69-71.)

### A. Toshiba's Claim For Damages Representing Royalties Due For The Semiannual Periods Since January 1, 2007 Falls Within The Applicable Statute of Limitations Period

In its second purported defense, CDI alleges that Toshiba's "claims are barred or limited by the relevant statute of limitations." However, as Toshiba represented to the Court at the preliminary conference, it only seeks damages for royalties that became overdue within the six years prior to the filing of the Complaint on September 24, 2013 (and interest thereon as provided in the contract).[10] Because, pursuant to the License Agreement, payment is due to made within 90 days following the end of each semiannual period (SUF ¶ 18), Toshiba's claims for unpaid royalties accrue on the 91st day after the end of each such period. Therefore, in the

---

[10] Under New York law, the statute of limitations for a breach of contract claim is six years. N.Y. C.P.L.R. § 213(2). "A cause of action for breach of contract ordinarily accrues and the limitations period begins to run upon breach." *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007).

current action, Toshiba seeks damages for claims accruing within the six years preceding September 24, 2013—which means royalties due for the semiannual period January 1 through June 30, 2007 (for which the claim accrued on September 29, 2007), and subsequent periods.

**B.    CDI's Third, Fourth And Eighth Affirmative Defenses Are Inapplicable To The Facts Of This Case**

Even were there facts to support them, CDI's third, fourth and eighth affirmative defenses fail as a matter of law.

*First,* CDI's third affirmative defense, laches, is inapplicable in this case because "[l]aches cannot be a defense to a *legal action for damages* if the action was commenced *within the statute of limitations period*." *Maxim Grp. LLC v. Life Partners Holdings, Inc*., 690 F. Supp. 2d 293, 310 (S.D.N.Y. 2010) (emphasis added); *see also RST (2005) Inc. v. Research in Motion Ltd*., No. 07 Civ. 3737, 2008 WL 5416379, at *7 (S.D.N.Y. Dec. 17, 2008) (holding laches not available in a breach of contract action for damages where plaintiff filed within the statute of limitations period). Indeed, "[t]he clear weight of authority" precludes a party from asserting laches against a breach of contract claim, "at least where the applicable statute of limitations for a breach of contract claim had not expired when the claim was brought." *Point 4 Data Corp. v. Tri-State Surgical Supply & Equipment, Ltd.*, No. 11 Civ. 726, 2013 WL 4409434, at *27 (E.D.N.Y. Aug. 2, 2013). Because Toshiba is seeking damages for claims accruing within the statute of limitations period, CDI's laches defense fails as a matter of law.

*Second,* CDI's fourth purported defense ("abandonment, waiver and/or estoppel") is equally unavailing. In order to prevail on these defenses, CDI must show that Toshiba somehow knowingly relinquished its rights under the contract. *See, e.g., Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc*., 807 F. Supp. 1007, 1021 (S.D.N.Y. 1992) ("In order to constitute abandonment, there must be a repudiation of the contract and a refusal to perform it."); *RST (2005) Inc.*, 2008

WL 5416379, at *7 ("Waiver applies as a successful affirmative defense only if the plaintiff *intentionally and knowingly* waived its right to recovery.") (emphasis added); *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F. 3d. 566, 607 (2d Cir. 2005) ("Under New York Law, the elements of estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts.") (internal quotation marks omitted). Here, there is simply no evidence that Toshiba knowingly refused to perform or falsely represented or concealed material facts. Nor does CDI's vague and conclusory pleading, or the few documents included in its initial disclosures, provide any basis for this defense.

Furthermore, the License Agreement between Toshiba and CDI explicitly requires all waivers to be made in writing and signed by the waiving party, and CDI has not alleged the existence of any such written waiver. (SUF ¶ 26.) Therefore, CDI's waiver defense fails as a matter of law. *See Maxim Grp.*, 690 F. Supp. 2d at 310 (granting summary judgment motion dismissing waiver affirmative defense because "[w]here, as here, the contract contains a no waiver provision . . . any waiver by either party must be in writing" and defendant did "not produce[] any written waiver excusing it from" performance).

*Third*, CDI's fourth purported defense, alleging that "Toshiba has failed to take reasonable actions to mitigate its damages," is unfounded. Under New York law, "[a] plaintiff in a contract case is required to take reasonable actions to minimize its damages. But the defense of failure to mitigate requires the defendant to establish not only that the plaintiff unreasonably failed to mitigate, but that reasonable efforts would have reduced the damages." *Coastal Power Int'l, Ltd. v. Transcon. Capital Corp.*, 10 F. Supp. 2d 345, 370 (S.D.N.Y. 1998). In this case, the

damages sought by Toshiba are the royalties that CDI failed to pay, and therefore there was nothing Toshiba could have done in mitigation.

### C. CDI's Contract-Related Defenses Are Without Legal Or Evidentiary Support

CDI's fifth, sixth, seventh, and ninth affirmative defenses are all contract-related, and all without merit.

*First*, as explained above (Part I.B), there is simply no basis for CDI's claim in its fifth affirmative defense that the License Agreement was terminated on or before July 22, 2008.

*Second*, while CDI's sixth affirmative defense claims that the terms of the License Agreement are so vague and indefinite as to make the agreement unenforceable, CDI fails to specify any such vague or indefinite term.[11]

*Third*, CDI's seventh affirmative defense, which claims that Toshiba failed to fulfill its obligations under the License Agreement "or otherwise provide consideration for the agreement," because Toshiba allegedly "failed to take any action to enforce the patents" it licensed, is entirely unsubstantiated. (Answer, Seventh Affirmative Defense.) The License Agreement contains no requirement that Toshiba enforce its patents as against third parties. (SUF ¶ 27.) Rather, pursuant to the License Agreement, Toshiba agreed to provide CDI a non-exclusive, non-transferable license to make, have made, use, import, offer for sale, sell, and otherwise dispose of DVD Products. (*Id*. ¶ 13.) As discussed above, CDI has been making and selling DVD Products with full knowledge that they utilize licensed patents, and Toshiba has,

---

[11] At the initial conference, CDI's counsel maintained that the License Agreement was indefinite because it did not include a list of the licensed patents. Prior to the conference, however, counsel for Toshiba provided CDI's counsel a complete copy of the executed license agreement as contained in Toshiba's original license file (a copy of which was sent to CDI by FedEx in June 2003)—which includes as Exhibit B a list of hundreds of licensed patents. (SUF ¶¶ 28, 68.)

pursuant to the License Agreement, allowed CDI to do so, rather than suing CDI for knowing patent infringement.  (*See supra* Part II.)  CDI has therefore received consideration—the ability to use the licensed patents, free from infringement litigation.[12]

*Fourth*, CDI's ninth affirmative defense, alleging Toshiba's material breach of the License Agreement "and or the material breach of the covenant of good faith and fair dealing" is equally vague and unsubstantiated, as well as legally deficient.  (Answer, Ninth Affirmative Defense.)  Toshiba has performed its obligations under the License Agreement.  (*See supra* Part II.)  And CDI has not (in its conclusory affirmative defenses) and cannot (in opposition to this motion) point to any conduct by Toshiba that had "the effect of destroying or injuring the other party to receive the fruits of the contract" such that CDI would have a valid defense based on the covenant of good faith and fair dealing.  *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (citation omitted).  Importantly, the implied covenant "can only impose an obligation consistent with other mutually agreed upon terms in the contract.  It does not add to the contract a substantive provision not included by the parties."  *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005) (internal quotation marks and citations omitted).

### D.    CDI's Conclusory Fraud Defenses Are Legally Deficient

CDI's tenth and eleventh affirmative defenses rest on conclusory allegations of fraud and/or misrepresentation that fail to meet the particularity requirements of Rule 9(b).  *See Yurman Design Inc. v. Chaindom Enters., Inc.*, No. 99 Civ. 9307, 2000 WL 897141, at *3 (S.D.N.Y. July 5, 2000) ("Defendants must plead their affirmative defenses alleging fraud with the particularity required by Fed. R. Civ. P. 9(b).").  Both the tenth and eleventh affirmative

---

[12]    And, by its own admission, CDI is well aware of the importance of obtaining licenses to manufacture DVDs, which it states on its own website are "covered by many patents."  (SUF ¶¶ 57, 61.)  It has posted multiple statements on its website exhorting its customers to ensure that any DVD replicators they engage are duly licensed and pay royalties.  (*Id.* ¶¶ 58-61.)

defenses fail to "(1) specify the statements that [CDI] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *MM Arizona Holdings LLC v. Bonanno*, 685 F. Supp. 2d 589, 594 (S.D.N.Y. 2009) (quoting *Romach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). Instead, they consist of vague assertions that, at unspecified times, "Plaintiff and or entities affiliated with Plaintiff" represented that the DVD Patent Licensing Group's patents were "essential to the manufacture of DVDs" and "made representations regarding participation and compliance rates with its licensing programs, and the proper implementation of uniform and non-discriminatory licensing." This lack of detail alone is sufficient to reject these defenses. *See EBS Dealing Res., Inc. v. Intercontinental Exch., Inc.*, 379 F. Supp. 2d 521, 532 (S.D.N.Y. 2005) (striking affirmative defense that failed "to provide sufficient detail as to the content of [the allegedly fraudulent] statements"); *Yurman Design*, 2000 WL 897141, at *3 (dismissing fraud affirmative defense for failure to plead with specificity).

Even if they had been adequately pled, both fraud defenses are entirely unsupported by the record. "At the summary judgment stage, a party must proffer enough proof to allow a reasonable jury to find by clear and convincing evidence the existence of each of the elements necessary to make out a claim for fraud in the inducement." *Woo*, 2000 WL 297114, at *4 (Scheindlin, J.) (internal citations omitted). Here, CDI cannot prove ***any*** element of its fraud claims, including the falsity of the alleged representations. Indeed, there is not a shred of evidence—including in CDI's initial disclosures—even suggesting that the many patents in the DVD6C pool are not essential for the manufacture of DVDs.[13] And there is similarly no record

---

[13] Tellingly, the list of licensed patents is included in the License Agreement and publicly listed on the DVD6C website. (SUF ¶¶ 14-16.) The patents themselves are public. (http://www.uspto.gov/patents/process/search/). And CDI is a sophisticated licensee, which

support for CDI's allegation that Toshiba falsely misrepresented "participation and compliance rates with its licensing programs, and the proper implementation of uniform and non-discriminatory licensing." Because Toshiba has made out a *prima facie* case of breach of contract, it is CDI's burden to establish by admissible evidence a genuine issue of material fact exists as to its fraud defenses—something it has not and cannot do, and "this lack of evidence is fatal." *MM Arizona Holdings*, 658 F. Supp. 2d at 594.

### E. Toshiba's Conclusory Defense of "Anti-Competitive Practices" Is Unsupported by Any Evidence or Legal Basis

CDI's conclusory twelfth affirmative defense—alleging "anti-competitive practices, including improper groupings of both patents and licensors"—is wholly unsupported by any evidence or legal basis. For this reason, CDI's twelfth affirmative defense must also fail.

\* \* \*

In sum, none of CDI's asserted defenses precludes summary judgment with respect to Toshiba's breach of contract claim, and therefore Toshiba should be awarded judgment on its claim as a matter of law.

## IV. CDI OWES TOSHIBA NEARLY $6 MILLION BASED ON ITS OWN WEBSITE

CDI has repeatedly failed to provide Toshiba with its required semiannual royalty reports. (SUF ¶ 33.) Nor did CDI include, in its initial disclosures, any computation of the amount of discs sold or otherwise transferred for which it would owe Toshiba royalties if Toshiba succeeds in obtaining summary judgment as to liability. (*Id.* ¶ 70.) However, while

---

claims to have a "state of the art" facility "equipped with the most advanced and efficient replication technology." (*Id.* ¶ 56.) Nothing prevents CDI from seeking to demonstrate that any of the patents in the DVD6C pool are not essential. Furthermore, CDI brags on its website that it continues to license essential patents from the DVD3C (a/k/a "One-Red") pool administered by Philips. (*Id.* ¶ 57.) CDI does not explain why it believes the patents licensed by the DVD3C pool are essential while those licensed by the DVD6C pool are not. Plainly, this defense is makeweight.

CDI has repeatedly declined to provide Toshiba with this information, it has made such information readily available to the public on its website. In fact, in August, CDI held a contest, asking its customers to guess the number of discs it has manufactured, and later posted the answer on its website. (*Id.* ¶ 62.). As reported in its August 19, 2013 website post, CDI had made 115,202,306 DVD discs as of that date. (*Id.*) At a rate of $.05 per a disc, as of August 19, 2013, CDI therefore owed Toshiba $5,760,115.30 in royalties. (*See id.* ¶¶ 62-63.) Furthermore, following its announcement of the winners of the contest, CDI posted a ticker on the bottom of its home page showing the number of DVD discs it continues to manufacture. (*Id.* ¶ 64.) Based on this ticker, CDI claims to be manufacturing discs at the rate of six discs per minute, or 8,640 discs per day. (*Id.* ¶ 65.) Based on this rate, CDI will have made approximately 1,157,760 discs in the 134 days between and including August 20, 2013 and December 31, 2013. (*Id.* ¶ 66.) Therefore, for this 134-day period, CDI owes Toshiba an additional $57,888.00 (*id.* ¶ 67), ***for a total of $5,818,003.30*** owed as of and including December 31, 2013 (excluding contractual interest). This damages calculation is without prejudice to Toshiba's right to claim royalties due for any periods following that ending December 31, 2013.

CDI has had every opportunity to account to Toshiba for the number of discs it sold during the period at issue—i.e. since January 1, 2007. Because it has failed to do so, Toshiba respectfully requests that judgment be entered, at the contracted rate of $.05 per disc, based on the number of DVD discs reported on CDI's website—totaling ***$5,831,395.30***, plus interest at the contracted rate of 2% per month to be computed at the time of entry of judgment.

## CONCLUSION

For the foregoing reasons, Toshiba respectfully requests that the Court grant its motion for summary judgment.

Dated: New York, New York
   January 31, 2014

        QUINN EMANUEL URQUHART
         & SULLIVAN, LLP

        By: _/s/ Carey. R. Ramos_____
         Carey R. Ramos
         (careyramos@quinnemanuel.com)
         Rachel E. Epstein
         (rachelepstein@quinnemanuel.com)
         51 Madison Ave, 22nd Floor
         New York, New York 10010
         Tel.: (212) 849-7000
         Fax: (212) 849-7100

        *Attorneys for Plaintiff Toshiba Corporation*